AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 2-12-2020)

# UNITED STATES DISTRICT COURT

for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| Information associated with One Target ) | Case No.   MJ20-610 |
| Telephone, for Investigation of 21 U.S.C. ) | |
| §§ 841 and 846, and Other Offenses ) | |

## APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I, Shawna McCann, a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachment A, located in the Western District of Washington, there is now concealed property and evidence described in Attachment B. This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crim P. 41(c) is *(check one or more)*:

☐ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 841, 846 | Conspiracy to Distribute Controlled Substances |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits. Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

☒ Delayed notice of 30 days (give exact ending date if more than 30 days: ___) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:
☒ by reliable electronic means; or ☐ telephonically recorded

09/18/2020  10:55 Am

*Applicant's signature*

Shawna McCann, Special Agent
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or
☒ The above-named officer provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:  September 21, 2020

*Judge's signature*

Michelle L. Peterson, United States Magistrate Judge
*Printed name and title*

City and state:  Seattle, Washington

USAO # 2019R01230

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

STATE OF WASHINGTON      )
                         )      ss
COUNTY OF KING           )

I, Shawna McCann, a Special Agent with the Federal Bureau of Investigation, Seattle, Washington, being first duly sworn, hereby depose and state as follows:

## **INTRODUCTION**

1.      I make this Affidavit in support of an Application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for authorization to obtain information about the location of a known cellular telephone used by NATASHA OAKLEY and assigned call number **(425) 902-8537,** with service provided by AT&T (hereinafter referred to as Target Telephone 3 or **TT3**).[1] **TT3** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

## ECPA

2.      The Court has jurisdiction to issue the proposed warrant under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## Pen Register Act

3.      Because this warrant seeks the prospective collection of information that falls within the statutory definitions of information collected by a "pen register" and/or

---

[1] Although AT&T is headquartered in Dallas, Texas, the Compliance Department to which this warrant will be sent is at 11760 US Highway 1,  Ste. 600, North Palm Beach, FL  22408.

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 1
USAO # 2019R01230

"trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

4.      The Court has jurisdiction to issue the requested pen-trap order because it is a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2). Specifically, the Court is a district court of the United States that "has jurisdiction over the offense being investigated." 18 U.S.C. § 3127(2)(A)(i).

5.      This application includes all the information required by the Pen Register Act. *See* 18 U.S.C. §§ 3122(b) & 3123(a)(1). Namely, Exhibit 1 to this application is a certification from Assistant United States Attorney Lyndsie Schmalz that (1) identifies the Federal Bureau of Investigation (FBI) as the law enforcement agency conducting the investigation and (2) certifies the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency. 18 U.S.C. § 3122(b). The Assistant United States Attorney is an "attorney for the government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

6.      A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3). A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication." 18 U.S.C. § 3127(4).

7.      In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls. Similar principles apply to other kinds of wire and electronic communications such as emails, text messages, connection logs, and data transfers. The prospective location data sought in this application constitutes "dialing, routing, addressing, and signaling information" covered by the Pen Register Act. Accordingly, the

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 2
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  requested warrant will record, decode, and/or capture dialing, routing, addressing, and

2  signaling information associated with the Target Cell Phone without geographic limit.

3      8.      The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and

4  3124(a)-(b), that the Court order through Attachment B of the requested warrant that

5  AT&T and any other person or entity providing wire or electronic communication service

6  in the United States whose assistance may facilitate execution of this warrant furnish,

7  upon service of the warrant, information, facilities, and technical assistance necessary to

8  install the pen/trap, including installation and operation of the pen-trap unobtrusively and

9  with minimum disruption of normal service. Any entity providing such assistance shall

10 be reasonably compensated by the FBI, pursuant to 18 U.S.C. § 3124(c), for reasonable

11 expenses incurred in providing facilities and assistance in furtherance of the warrant.

12     9.      **Through this application, the United States does not request and does**

13 **not seek to obtain the contents of any communications, as defined in 18 U.S.C.**

14 **§ 2510(8).**

15                    **AGENT BACKGROUND**

16     10.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and

17 have been employed with the FBI since September, 2017.  I am currently assigned to the

18 Seattle Field Division where I am a member of the violent crime, gang, and Transnational

19 Organized Crime – Western Hemisphere squad. As an FBI Special Agent, I have

20 investigated a variety of drug-related crimes, including cases involving the introduction

21 and possession of controlled substances and other contraband in a federal detention

22 center.  In this capacity, I investigate, *inter alia*, violations of Title 18, United States

23 Code, Section 1791 (providing or possessing contraband in prison) and related offenses. I

24 have received specialized training in the enforcement and investigation of drug-related

25 crimes. I have received over 400 hours of classroom training including, but not limited to,

26 drug identification, drug interdiction, smuggling, and the investigation of individuals

27 and/or organizations involved in the illegal possession, possession for sale, sales,

28 importation, smuggling, manufacturing, and trafficking of controlled substances.

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 3
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

11.     During my career as a Special Agent, I have participated in narcotics investigations (*e.g.*, heroin, cocaine, marijuana, and methamphetamine) that have resulted in the arrest of individuals and the seizure of illicit narcotics and/or narcotics-related evidence and the forfeiture of narcotics-related assets. I have been involved in the service of federal and state search warrants as part of these investigations. I have encountered and have become familiar with various tools, methods, trends, paraphernalia, and related articles utilized by various traffickers in their efforts to import, export, conceal, and distribute controlled substances. I am also familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their unlawful operations, and how they code their conversations to disguise their unlawful activities. I am also familiar with the various methods of packaging, delivering, transferring, and laundering drug proceeds. Additionally, through my training and experience, I can identify illegal drugs by sight, odor, and texture.

12.     I have also worked on drug investigations involving the use of court-authorized wiretaps under Title III and monitoring of recorded prison phone calls. During these investigations, I have had the opportunity to monitor, listen to, and review transcripts and line sheets (prepared by linguists) documenting the content of hundreds of intercepted conversations involving the trafficking of cocaine, methamphetamine, heroin, and other narcotics, by persons who used some form of code to attempt to thwart detection by law enforcement. I have also interviewed defendants at the time of their arrest and have debriefed, spoken with, and/or interviewed numerous drug dealers or confidential sources at proffer and field interviews who were experienced in speaking in coded conversation over the telephone. From these interviews, and also from discussions with other experienced agents,[2] I have gained knowledge regarding the various methods,

_____

[2] When I use the term "agents" throughout this Affidavit, I am referring to law enforcement personnel including, but not limited to, FBI agents, task force officers, Seattle Police Department sergeants, detectives, and officers, and federal detention center staff.

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 4
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

techniques, codes, and/or jargon used by drug traffickers in the course of their criminal activities, including their use of cellular telephones and other electronic means to facilitate communications while avoiding law enforcement scrutiny.

13.     I have written affidavits in support of court-authorized federal warrants and orders in the Western District of Washington for Global Positioning Device ("GPS") tracking of telephones, Pen Register/Trap and Trace, and search warrants. Additionally, I have testified in grand jury proceedings, written investigative reports, and conducted and participated in numerous interviews of drug traffickers of various roles within drug organizations, which has provided me with a greater understanding of the methods by which drug trafficking organizations operate. I have also conducted and participated in numerous interviews of inmate victims, inmate witnesses, and inmate subjects, which have provided me with a greater understanding of drug-related offenses committed in federal detention centers.

14.     Based upon my experience and training with the FBI as well as conversations I have had with other agents and law enforcement officers who specialize in narcotics investigations, including investigations into the laundering of narcotics trafficking proceeds, and I am familiar with the methods, tactics, and techniques utilized by narcotics trafficking/money laundering organizations. I have spoken with federal agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews. Through my conversations with these agents and other law enforcement officers, I am knowledgeable in the methods and modes of narcotics trafficking/money laundering operations.

15.     Based on my training and experience, I know narcotics traffickers often require the use of one or more communication facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. I know international and domestic narcotics trafficking organizations often depend on maintaining timely long-distance and local connections

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 5
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

between original sources of supply and those down the organizational chain. Narcotics traffickers utilize a variety of communication methods, including telephone communications, encrypted messaging applications, and email. I also know narcotics traffickers often use fraudulent information to subscribe to communication facilities, and frequently change communication facilities to thwart law enforcement efforts to intercept their communications.

16.    Based on my training and experience, and my discussions with other experienced officers and agents involved in drug investigations, I know that drug dealers use cellular telephones as a tool or instrumentality in committing their criminal activity. They use them to maintain contact with their suppliers, distributors, and customers. They prefer cellular telephones because they can be purchased without the location and personal information that land lines require. They can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs. They can also be passed between members of a drug conspiracy to allow substitution when one member leaves the area temporarily. I also know that it is common for drug traffickers to retain in their possession phones that they previously used, but have discontinued actively using, for their drug trafficking business. Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes.

17.    The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN; Mobile Identification Number, or MIN; International Mobile Subscriber Identity, or IMSI; or International Mobile Equipment Identity, or IMEI are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone. This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 6
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  a part of a package, and to confirm if the telephone was contacted by a cooperating

2  source or was intercepted on a wiretap here or in another district.

3      18.    The facts set forth in this Affidavit are based on my personal knowledge;

4  knowledge obtained from others during my participation in this investigation, including

5  other law enforcement officers; review of documents and records related to this

6  investigation; communications with others who have personal knowledge of the events

7  and circumstances described herein; and information gained through my training and

8  experience.  Because this Affidavit is submitted for the limited purpose of establishing

9  probable cause in support of the Application for a search warrant, it does not set forth

10  each and every fact that I or others have learned during the course of this investigation.

11      19.    Based on the facts set forth in this affidavit, there is probable cause to

12  believe that NATASHA OAKLEY has violated 21 U.S.C. §§ 841(a)(1) and (b)(1)(B),

13  and 846 (conspiracy to distribute methamphetamine and heroin), and 18 U.S.C.

14  § 1791(a)(1) and (b)(4) (attempting to provide contraband in prison).  OAKLEY was

15  charged by Indictment with these crimes on August 20, 2020 and is the subject of an

16  arrest warrant issued on August 20, 2020.  There is also probable cause to believe that

17  OAKLEY is aware of these charges and is evading arrest.  There is also probable cause to

18  believe that the location information described in Attachment B will assist law

19  enforcement in arresting OAKLEY, who is a "person to be arrested" within the meaning

20  of Federal Rule of Criminal Procedure 41(c)(4).

21              **STATEMENT OF PROBABLE CAUSE**

22      20.    As discussed in more detail below, JERON HANSON, an inmate at the

23  Sea-Tac Federal Detention Center ("FDC"), planned with his girlfriend, NATASHA

24  OAKLEY, to introduce controlled substances and a contraband cellular phone into the

25  FDC on December 16, 2019.[3]  Inmate emails, witness interviews, and surveillance

26

27  _____

28  [3] Three other individuals have been charged in connection with a plan to introduce contraband
into the FDC on the evening of December 16, 2019: Haben Sebhatu, Atakilte Berhane, and Mims
Gray.  All three of these individuals are currently charged in a Superseding Information with one

footage from the FDC on the night of December 16, 2019 demonstrate that OAKLEY took advantage of the facility's visiting hours to hide a cell phone and controlled substances, including methamphetamine and heroin, in a trash can in the lobby bathroom, where they could later be retrieved by an inmate working on the maintenance crew. Technicians with the FDC's Special Investigative Services ("SIS") intercepted the drugs and phone before they could be introduced into the secure side of the facility.

### Plan to Introduce Contraband into the FDC

21.     In December, 2019, HANSON was an inmate at the FDC and had the ability to make phone calls, which were recorded, and to send emails.  Agents have reviewed emails and phone calls exchanged between HANSON and OAKLEY in December 2019, in which HANSON and OAKLEY planned to introduce controlled substances and a cell phone into the FDC using coded language.

22.     On the afternoon of December 8, 2019, HANSON sent an email to OAKLEY, telling her that a friend of his was supposed to give her "some christmas presents" for HANSON's "son."  HANSON asked OAKLEY to wrap the presents and to ask his friend "any questions" that she had.  HANSON also told OAKLEY that he was thinking of getting his son a cell phone, but was "not sure his mom would allow it." HANSON then warned OAKLEY: "just remember you cant be bulshitting at all, when i ask you to go drop off his gifts do it ok."

23.     Based on my training and experience, and what I have learned in the course of this investigation, I believe that this email references the plan between HANSON and OAKLEY to introduce drugs and a cell phone into the FDC.  First, based on my training and my experience investigating offenses at the FDC, I know that "birthday present" and "Christmas present" are common terms used by inmates to refer to drug contraband intended to be smuggled into prison facilities.  Second, the investigation has uncovered no evidence indicating that Hanson has a son.  Agents have interviewed a number of

count of attempting to provide or possess a contraband cellular phone in a federal detention facility, a misdemeanor, in violation of Title 18, United States Code, Section 1791.

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 8
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    witnesses familiar with HANSON, including the mother of his minor daughter, and none
2    of them knew HANSON to have a son.  Agents have also reviewed portions of
3    HANSON's inmate emails and social media accounts associated with HANSON, which
4    do not contain any references to HANSON having a son other than these emails to
5    OAKLEY in the week leading up to December 16, 2019.

6         24.     The next morning, on December 9, 2019, HANSON sent an email to
7    OAKLEY telling her that he needed her to prepare his son's "bday presents," including:
8    "$ from the homies, some jordans the white retro ones size 7 i have, the black ones size 7.
9    and try to find those shoes i got rooster before he got out, i forgot what they were called
10   but he'll know what ones im talking about."  HANSON then reminds OAKLEY that it is
11   important that she prepare the presents and "have everything wrapped nicely," because
12   "christmas is right around the corner."  Based on my training and experience, I believe
13   that the references in this email to different colors and types of shoes are code for
14   methamphetamine, heroin, and other controlled substances.   "Clear" and "white" are
15   common terms used by drug users, dealers, and traffickers to refer to methamphetamine
16   due to the substance's color, and "black" and "dark" are common terms for heroin for the
17   same reason.  Moreover, in this email HANSON refers to his "sons bday presents";
18   whereas, in the prior email HANSON referred to "christmas presents for my son", which
19   shows that HANSON is mixing up the common code words for drugs and that the true
20   intention of his words is meant as code for asking for drugs, and not a present for a son.

21        25.     In emails on December 10, 2019, HANSON tells OAKLEY that she needs
22   to get his sons presents together and "order him another cellphone," like the one
23   HANSON had when he was "in treatment."  HANSON also asks OAKLEY to "get it
24   together" and to be "on top of" things because he needs her "now more than ever."

25        26.     In emails on December 11, 2019, HANSON made multiple requests that
26   OAKLEY order a phone for his "son" "asap," because he did not want the present to be
27   "late."

28

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 9
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

27.     On Thursday, December 12, 2019, HANSON continued to request that OAKLEY order a phone for his son.  In his emails, HANSON told OAKLEY that she should "have it delievered by this weekend," meaning that, if she had not yet ordered the phone, she needed to "do it today."  In these emails, HANSON also instructed OAKLEY to collect money from his friends.  Based on my training and experience, and the investigation I have conducted, I believe that this money was meant to pay the inmate who would retrieve the contraband that OAKLEY would drop off at the facility.

28.     On the evening of Friday, December 13, 2019, HANSON sent OAKLEY an email stating: "let me know if you were able to order them presents?? i need them by here by next weekend. i need the 100 and the shoes this weekend though. its important you dont bs at all . . . i dont want to let my kids down this christmas."  Based on my training and experience, and other emails I have reviewed, I believe HANSON's reference to ordering presents is a legitimate reference to OAKLEY ordering Christmas presents for HANSON's daughter.  HANSON's email makes a clear distinction, however, between the Christmas presents to be ordered by OAKLEY and the "shoes" that are needed that weekend, which are a reference to drugs.  Moreover, as HANSON is not known to have more than one child, I believe that the reference to not wanting to let his "kids" down this Christmas is code for HANSON not wanting to disappoint the other inmates in his unit by failing to get drugs and a cell phone into the facility.

29.     Over the weekend, on December 14 and 15, HANSON sent OAKLEY several emails impressing upon her the importance of getting everything done because "timing is critical."  HANSON also repeatedly asks OAKLEY to collect money, because he needs "400 but anything helps."  Finally, on the afternoon of December 15, 2020, HANSON emailed OAKLEY:  "i dont know why you cant show up on f***ing time to pick up my son. i swear if you f*** up my visting rights ill be pissed off at you for real. i ask you to just tkae care of certain shit for me and if you let me down i wont f***ing forgive you."  Two hours later, HANSON made a recorded prison phone call to OAKLEY, during which OAKLEY stated that the money was being put on the inmate's

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 10
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

books.  FDC records show that, on December 15, 2019 at approximately 6:02 p.m., a Western Union wire transfer in the amount of $500 was sent to inmate Mims Gray, who worked on the maintenance crew, from Z.K.  As discussed below, Z.K. is a friend of OAKLEY.

30.     On the evening of December 15, 2019, HANSON sent OAKLEY an email telling her that "tomorrow is a very important day, you get to watch my son so make sure and not be late at all."  Based on my training and experience, and the fact that HANSON is not known to have a son, I believe HANSON is telling OAKLEY that tomorrow – December 16, 2019 – is the day of the planned introduction of drugs and a cell phone into the FDC and that OAKLEY cannot be late.

**Introduction of Contraband into the FDC on December 16, 2019**

31.     In mid-December, 2019, the FDC received information that someone would attempt to introduce contraband into the facility through the lobby visitor's bathroom on December 16, 2019.  Investigators inspected the bathroom for contraband throughout the day but, before 5:00 p.m., did not observe or locate any contraband.

32.     Later in the evening, at approximately 10:31 p.m., SIS Technicians discovered the following items of contraband in a trash can in the FDC visitor's bathroom, concealed in a McDonald's bag and wrapped in plastic wrap:

a.     One black LG cell phone, model LM-X320PM, MEID-D number 089 713 128 000 602 505;

b.     58 Suboxone-type strips, which laboratory testing has confirmed contain buprenorphine;

c.     2 small plastic bags containing a total of 6.1 grams of a black tar-like substance, which laboratory testing has confirmed as heroin; and

d.     2 small plastic bags containing a total of 10.5 grams of a white crystalline substance, which laboratory testing has confirmed as pure methamphetamine.

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 11
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Agents conducted latent print testing on the above evidence items and identified a latent print on the Suboxone strips. This latent print was compared and found to be a match to a female, L.P.

33.     Shortly after the recovery of the contraband on December 16, 2019, SIS Technicians created a decoy contraband package, placed the decoy contraband package back into the McDonald's bag, and placed the McDonald's bag back into the trash can of the front lobby bathroom of FDC.   The decoy contraband package was collected by inmate Mims Gray, who works on the maintenance crew and has access to the FDC front lobby during his cleaning duties.  SIS Technicians stopped Gray as he came back into the secure area of the FDC and found that Gray had removed the decoy contraband package from the McDonald's bag and placed it into the bag that he had been using to collect trash.

34.     Investigators later reviewed the video surveillance footage from the FDC and discovered that, at approximately 7:26 p.m., a white, 2-door pickup truck had entered the FDC parking lot and parked in the visitor parking area.  Based on interviews with individuals familiar with her, agents have identified the woman in the surveillance footage as OAKLEY.  OAKLEY exited the driver's seat of the white pickup truck and walked to the front lobby of the FDC at approximately 7:44 p.m.  OAKLEY can be seen looking in the direction of the bathrooms immediately upon entering the FDC lobby, and she then attempted to access the first bathroom in the lobby (which is for staff use only and is kept locked).  OAKLEY spoke to J.S., the FDC staff person working the front lobby, and then walked towards and went inside the unlocked, second bathroom.  Three minutes later, the video shows OAKLEY exiting the bathroom and departing the FDC without attempting to visit any inmate.  Agents have been advised by SIS Technicians that OAKLEY was not an approved visitor for any inmate at the FDC; therefore, OAKLEY would not have had a legitimate purpose for going to the FDC during the evening visiting hours on December 16, 2019.

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 12
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Identification of OAKLEY**

35.     In May 2020, agents interviewed J.S., the FDC staff member who was working in the facility lobby on the evening of December 16, 2019.  J.S. was shown a Department of Licensing photograph of OAKLEY and positively identified OAKLEY as the woman in the surveillance video who accessed the visitor's bathroom on the evening of December 16, 2019.

36.     Agents also conducted an interview of L.P., the individual whose fingerprint was found on the Suboxone strips.  After initially denying her involvement in any drug activity, L.P. stated that OAKLEY procured the Suboxone strips and that L.P. assisted OAKLEY with taping the strips together and packaging them. L.P. stated that OAKLEY did not tell her what the Suboxone strips were for or why the Suboxone strips were being packaged in such a manner. L.P. described the physical features of OAKLEY, including height and weight, which was similar to the height and weight of the women in the surveillance footage who introduced the drugs and cell phone into the FDC.

37.     Agents have also interviewed Z.K., the individual who conducted a wire transfer of $500 to inmate Mims Gray on the evening of December 15, 2019.  After initially telling agents that a stranger asked him to send the payment, Z.K. stated that OAKLEY asked Z.K. to send a Western Union wire transfer of $500 to inmate Gray. Z.K. described the physical features of OAKLEY, including height and weight, which was similar to the height and weight of the woman in the surveillance footage who introduced the drugs and cell phone into the FDC. Z.K. stated that around the time OAKLEY asked him to wire $500 to Gray, OAKLEY was driving a white 2-door pickup truck. Agents showed Z.K. the surveillance photographs of the woman and the white truck and Z.K. stated that the woman looked like OAKLEY based on body structure and that the truck looked like the truck OAKLEY was driving in December 2019.

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 13
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

38.     Finally, agents have interviewed the owner of the white 2-door pickup truck, M.A.[4] Agents showed M.A. the surveillance photograph of the white 2-door pickup truck at the FDC, and M.A. stated that the photograph looked like his white 2-door Chevy Colorado with an extended cab.  M.A. stated that, in December 2019, he let OAKLEY borrow the truck. M.A. described the physical features of OAKLEY, including height and weight, which was similar to the height and weight of the women in the surveillance footage who introduced the drugs and cell phone into the FDC. Agents showed M.A. the surveillance photograph of the woman at the FDC who introduced drugs and a cell phone, and M.A. stated that the woman in the photograph looked like OAKLEY.

39.     During the interview with M.A., M.A. received a call from OAKLEY, who was using a phone number ending in 8839. M.A. placed the call on speaker phone so that agents could hear the conversation. M.A. told OAKLEY that the police had talked to him about OAKLEY using his truck to drive to the FDC and introduce drug and cell phone contraband into the FDC. OAKLEY admitted that she was at the FDC in the white truck but told M.A. that someone else who was there at the same time left the drugs and cell phone contraband. OAKLEY also told M.A. that she has not done anything illegal since that night at the FDC.

40.     HANSON was transferred from the FDC to a halfway house in Seattle, Washington, on May 20, 2020.  Agents conducted surveillance at the halfway house on that day and, at approximately 11:30 a.m., a white Chevy Colorado truck drove by. Agents followed the truck and were able to identify it by its license plates as belonging to M.A. and confirm that it was being driven by OAKLEY.

---

[4] In the emails between HANSON and OAKLEY, OAKLEY stated that on December 8, 2019 she locked the keys in the truck and had to call the owner of the truck, M.A., to help get the keys out. Additionally, agents located two police incident reports in October 2019 and January 2020 in which OAKLEY was listed as the driver/occupant of a white 2007 Chevy Colorado.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

41.     On May 27, 2020, agents observed OAKLEY and HANSON driving in a grey Chevy Tahoe bearing Washington license plate ARZ3393, and registered to M.A., the same owner as the white Chevy Colorado truck. As OAKLEY and HANSON were walking back to and about to enter the Chevy Tahoe to depart a parking lot, agents stopped OAKLEY and HANSON and executed search warrants for OAKLEY's person and the Chevy Tahoe that OAKLEY had been observed occupying. During the search, agents located two cell phone devices associated with OAKLEY, which were seized for evidence of the conspiracy to distribute methamphetamine and heroin in to the FDC on December 16, 2019. One of the cell phones seized was the phone number ending in 8839.

### Charges Against and Arrest Warrant Issued For OAKLEY

42.     On August 4, 2020, the Honorable Mary Alice Theiler, United States Magistrate Judge for the Western District of Washington, signed a Criminal Complaint and Arrest Warrants for OAKLEY and HANSON for violations of Title 21 United States Code, Sections 841(a)(1) and (b)(1)(B) and 846, Conspiracy to Distribute Methamphetamine and Heroin.

43.     Because HANSON was still under Bureau of Prisons custody at the halfway house, the Bureau of Prisons transferred him back to the FDC before the FBI could locate and coordinate a simultaneous arrest of OAKLEY.  HANSON was transferred back to the FDC on August 6, 2020 and had his initial appearance on the Complaint on August 7, 2020.

44.     On August 20, 2020, HANSON and OAKLEY were indicted on violations of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B) and 846 (conspiracy to distribute methamphetamine and heroin) and Title 18, United States Code, Section 1791(a) and (b)(4) (attempting to possess/provide contraband in prison). On August 20, 2020, an arrest warrant was issued for OAKLEY.  As set forth below, in the time since this arrest warrant was issued, OAKLEY has yet to be located by agents, is aware of the arrest warrant issued for her, and has fled or otherwise eluded agents in executing the arrest warrant, *inter alia,* and is using **TT3**.

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 15
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### OAKLEY's Use of TT3 While Evading Arrest

45.     On August 12, 2020, FBI Seattle attempted to locate and arrest OAKLEY by visiting four residences associated with OAKLEY, her friends, and her family: an apartment in Redmond, Washigton, a house in Kirkland, Washington, a condo in Sammamish, and a house in Sammamish.  Agents spoke with a number of OAKLEY's family members and acquaintances, and learned that OAKLEY was aware that HANSON had been arrested and that agents were looking to arrest her as well.

46.     Agents further learned that OAKLEY was using a cell phone with the number 206-605-8831 ("TT2") to communicate with family and friends about her whereabouts and the charges against her.  On August 25, 2020, the Honorable Paula L. McCandlis, United States Magistrate Judge for the Western District of Washington, signed a search warrant and pen-trap order requiring AT&T to provide agents with records and information associated with TT2, including historical and prospective cell site location information.  When agents executed this warrant, there was no real time GPS location data coming in for TT2, indicating that OAKLEY had likely stopped using TT2. Agents called TT2 and received an automated message informing themt that service had been disconnected, confirming that OAKLEY had ceased using TT2.

47.     Agents have discovered that, in the time since HANSON was arrested on the pending charges, OAKLEY and her mother, Vera Oakley, have been sending cards and letters to HANSON at the FDC.[5]  In reviewing these cards and letters, investigators have confirmed that OAKLEY is aware of the warrant for her and is evading arrest, and that her mother is aware of OAKLEY's current whereabouts.  Specifically, in a letter from OAKLEY to HANSON, OAKLEY writes: "Its been rough out here, my neece sent me a lovely photo that poped up of me on her twitter, its my wanted poster."  OAKLEY's

---

[5] In August and September 2020, HANSON has received several letters in the FDC from a "Ludmila Yova."  Based on the handwriting, which I and other agents have compared to other prison letters to HANSON from OAKLEY, and based on the content of the letters, agents believe these letters sent using the alias Ludmila Yova are from OAKLEY, which further shows the efforts OAKLEY has taken to avoid law enforcement detection and her arrest.

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 16
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  mother has thus far refused to cooperate with investigators regarding her daughter's
2  whereabouts.

3      48.    After OAKLEY apparently stopped using TT2, investigators were not
4  aware of any phone number that OAKLEY was using.  Additionally, the only vehicle that
5  OAKLEY has been known to drive, a grey Chevy Tahoe bearing Washington license
6  plate ARZ3393, was found abandoned on the side of the road on or about August 21,
7  2020.

8      49.    On September 16, 2020, HANSON called **TT3** on a recorded prison line.
9  A woman answered the call and, based on listening to other recorded prison phone calls
10 between HANSON and OAKLEY, I recognized the voice on this call to be OAKLEY.
11 During this call, HANSON and OAKLEY discussed her correspondence with HANSON
12 and her current whereabouts at a "lake house."  OAKLEY further talked about not having
13 a car anymore and complained that she cannot walk around in public right now –
14 presumably because of the warrant for her arrest – and HANSON scolded OAKLEY for
15 not sticking to a "plan." Based on this call, investigators believe that OAKLEY is
16 currently using **TT3** to communicate with others about her location.  Moreover, with
17 OAKLEY no longer using TT2 or her abandoned vehicle, the only information agents
18 have connected to OAKLEY to assist in locating her is **TT3**.

**Prior Applications**

20     50.    On May 21, 2020, the Honorable Mary Alice Theiler, United States
21 Magistrate Judge for the Western District of Washington, signed a search warrant for the
22 search of OAKLEY's person and any vehicle that OAKLEY is driving and/or occupying
23 to seize narcotics and cell phones.  These search warrants were executed on May 27,
24 2020.

25     51.    On August 25, 2020, the Honorable Paula L. McCandlis, United States
26 Magistrate Judge for the Western District of Washington, signed a search warrant and
27 pen-trap order requiring AT&T to provide agents with records and information associated
28 with TT2, including historical and prospective cell site location information.

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 17
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

52.     Agents have attempted to locate OAKLEY for the purpose of executing the arrest warrant for her through conducting physical surveillance on and interviews at OAKLEY's known residence and the residences of OAKLEY's family and associates. Agents also issued a "Be On the Lookout" bulletin to law enforcement in the Western Washignton area and have worked with Snoqualmie Casino security to flag anytime OAKLEY uses her player's card or drives the Chevy Tahoe (if it is repaired) to the casino. Lastly, agents placed OAKLEY on Washington's Most Wanted list and television program, in the hopes of obtaining tips on the whereabouts of OAKLEY; however, agents have yet to receive any credible or fruitful tips. Accoringly, agents have been unable to locate OAKLEY through these investigative methods.

53.     The search warrant for location data on **TT3,** in conjunction with a pen register and trap and trace device installed on **TT3,** will aid agents by assisting in the location and arrest of fugitive OAKLEY.

## KNOWLEDGE OF CELL PHONE PROVIDERS

54.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by pen-traps and indicate the identity of the cellular device making the communication without revealing the communication's content.

55.     Based on my training and experience, I know that when a cell phone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower, and the cellular antenna or tower records those identifiers as a

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 18
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

matter of course. The unique identifiers -- as transmitted from a cell phone to a cellular antenna or tower -- are like the telephone number of an incoming call. They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content. In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents.

56.    Based my training and experience, I know that a cell phone can also be used to exchange text messages with email accounts. The email addresses associated with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

57.    Based on my training and experience, I know that cellular phones can connect to the internet via a cellular network. When connecting through a cellular network, internet communications sent and received by the cellular phone each contain the same unique identifier that identifies cellular voice communications, such as an ESN, MEIN, MIN, SIM, IMSI, MSISDN, or IMEI. Internet communications from a cellular phone also contain the IP address associated with that cellular phone at the time of the communication. Each of these unique identifiers can be used to identify parties to a communication without revealing the communication's contents.

58.    In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that certain providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data (also known as GPS data or latitude-longitude data) and cell-site data (also known as "tower/face information" or cell tower/sector records). E-911 Phase II data provides relatively precise location information about the

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 19
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   cellular telephone itself, either via GPS tracking technology built into the phone or by
2   triangulating on the device's signal using data from several of the provider's cell towers.
3   Cell-site data identifies the cell towers (i.e., antenna towers covering specific geographic
4   areas) that received a radio signal from the cellular telephone and, in some cases, the
5   "sector" (i.e., faces of the towers) to which the telephone connected. These towers are
6   often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in
7   rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve
8   every call made to or from that device. Accordingly, cell-site data is typically less precise
9   that E-911 Phase II data.

10      59.     Based on my training and experience, I know that AT&T can collect E-911
11   Phase II data about the location of **TT3**, including by initiating a signal to determine the
12   location of **TT3** on AT&T's network or with such other reference points as may be
13   reasonably available.

14      60.     When using a cellular connection to receive or transmit data, a cellular
15   phone typically utilizes a cell tower to make telephone calls, send or receive text
16   messages, send or receive emails, surf the internet, carry out application initiated data
17   transfers, among other things.

18      61.     Based on my training and experience, I know that AT&T can collect cell-
19   site data about **TT3**. Based on my training and experience, I know that for each
20   communication (including data connections) a cellular device makes, its wireless service
21   provider can typically determine: (1) the date and time of the communication; (2) the
22   telephone numbers involved, if any; (3) the cell tower to which the customer connected at
23   the beginning of the communication; (4) the cell tower to which the customer connected
24   at the end of the communication; and (5) the duration of the communication. I also know
25   that wireless providers such as AT&T typically collect and retain cell-site data pertaining
26   to cellular devices to which they provide service in their normal course of business in
27   order to use this information for various business-related purposes.

28

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 20
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

62.     Different service providers use different systems, applications, and reports to collect or analyze cell site data. These systems, applications, and reports are referred to by a variety of names including, but not limited to real-time tool or "RTT" (Verizon), Periodic Location Updates or "PLU" (Verizon), per call measurement data or "PCMD" (Sprint), Network Event Location System or "NELOS" (AT&T), EVDO, ALULTE, Timing Advance, and TruCall. RTT data, for example, estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

63.     Based on my training and experience, I know that wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **TT3**'s user or users and may assist in the identification of co-conspirators and/or victims.

64.     Modern cell phones allow users to switch their telephone numbers, use multiple telephone numbers on a single device, and transfer their telephone number to a different cell phone. These changes can be made with the assistance of the wireless provider or by taking actions such as changing the "SIM card" (short for "subscriber identity module card") of a cellphone. To provide for any such changes made to **TT3**, Attachment A specifies that the property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 21
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

## AUTHORIZATION REQUEST

65.     Based upon the facts contained in this Affidavit, I submit that probable cause exists to believe that **TT3** has been used by OAKLEY to flee and evade her arrest. Based on a recorded call between HANSON and OAKLEY, I believe **TT3** is being used by OAKLEY.  I believe that information obtained from the requested pen register and trap and trace device and real-time GPS location data on **TT3** will assist in identifying the location of OAKLEY and in executing the arrest warrant for OAKLEY.

66.     Based on the foregoing, I request that the Court issue the proposed search warrant and pen-trap orders, pursuant to Federal Rule of Criminal Procedure 41, 18 U.S.C. § 2703(c), and 18 U.S.C. § 3123.

67.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice to the subscriber or user of the Target Cell Phone until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 22
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

68.     I further request that the Court direct AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of **TT3** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The agency shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

69.     Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant by serving the warrant on AT&T. Because the warrant will be served on AT&T, who will then compile the requested records and data, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **TT3** outside of daytime hours.

### REQUEST FOR SEALING

70.     I further request that the Court order that all papers in support of this Application, including the Affidavit, Search Warrant, and Pen/Trap Order, and all related documents, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 23
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    investigation. Accordingly, there is good cause to seal these documents because their

2    premature disclosure may seriously jeopardize that investigation.

3

4                                   _____ 09/18/2020  10:55AM

5                                   Shawna McCann, Affiant
                                    Special Agent, FBI
6

7          The above-named agent provided a sworn statement to the truth of the foregoing

8    affidavit by telephone on the 21st day of September, 2020.

9

10

11                                  _____

12                                  MICHELLE L. PETERSON
                                    United States Magistrate Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SPECIAL AGENT SHAWNA MCCANN - 24
USAO # 2019R01230

**EXHIBIT 1**

<u>DECLARATION</u>

I, Lyndsie Schmalz, declare as follows:

1.      I am a duly appointed Assistant United States Attorney for the Western District of Washington, and I have primary responsibility for representing the interests of the United States herein.

2.      I make this declaration in support of an Application for a search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) with an integrated pen-trap order pursuant to 18 U.S.C. §§ 3122 and 3123. Pursuant to 18 U.S.C. § 3122(a)(1), I am the applicant for purposes of the pen-trap portion of the requested warrant and order.

3.      Pursuant to 18 U.S.C. § 3122(b), I certify that the FBI is the law enforcement agency conducting the investigation in this matter and that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by that agency.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing Application is made on the basis of information officially furnished, and on that basis I verily believe such information to be true.

Executed this 21st day of September, 2020.

*/s/ Lyndsie R. Schmalz*
LYNDSIE R. SCHMALZ
Assistant United States Attorney

EXHIBIT 1 -- PAGE 1
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT A

## Property to Be Searched and Subscriber/Subject Information

1.      Records and information associated with the following cellular phone:

**(425) 902-8537,** believed to be used by NATASHA OAKLEY, with service provided by AT&T (hereinafter referred to as Target Telephone 3 or **TT3**).

that are in the custody or control of AT&T, a company headquartered at 208 S. Akard St., Dallas, Texas 75202. The user of the Target Cell Phone (**TT3**) is believed to be NATASHA OAKLEY. The identity of the person who is a subject of the criminal investigation is NATASHA OAKLEY.

2.      The Target Cell Phone (**TT3**)

3.      The property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

ATTACHMENT A1 -- PAGE 1
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

**Particular Things to be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127. As such, this Warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Cell Phone (**TT3**). **This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8).** Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

**I.      Information to be Disclosed by AT&T**

1.      **Pen Register/Trap and Trace Data and Associated Subscriber Records to Be Provided for a Period of 45 Days for TT3.**

a.      AT&T shall install and monitor pen-trap devices to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone (**TT3**) including the date, time, and duration of the communication, and the following, without geographic limit and without notice to the subscriber:

(i)      IP addresses associated with the cell phone device or devices used to send or receive electronic communications;

(ii)      Any unique identifiers associated with the cell phone device or devices used to make and receive calls with the cell phone number described in Attachment A, or to send or receive other electronic communications, including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN;

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(iii)   IP addresses of any websites or other servers to which the cell phone device or devices connected; and

(iv)   Source and destination telephone numbers and email addresses.

b.   On a 24-hour-a-day basis, for the duration of the authorized pen-trap devices, AT&T shall provide the following records for those subscribers whose identifiers are obtained pursuant to the use of the pen-trap devices: published or non-published subscriber names and addresses, including billing addresses.

2.   **Historical Cell Cite Location Information for TT3.**

a.   All records and other information (**not including the contents of communications**) relating to wire and electronic communications sent or received by the Account from August 7, 2020 to the present including:

i.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii.   historical cell site information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.  This information is to be provided irrespective of the application, name, or report utilized by AT&T.  Accordingly, this information includes the following data sets to the extent that they are collected by AT&T: RTT, PLU, PCMD, NELOS, EVDO, TruCall, ALULTE, and Timing Advance.

b.   The physical address and coverage maps of cell towers used by the Target Cell Phone (**TT3**).

3.   **Prospective Cell Site Location Information for TT3.**

c.   All information about the location of the Target Cell Phone (**TT3**) described in Attachment A for **a period of 45 days**, during all times of day and night. This information includes: precise location information, as well as all data

ATTACHMENT B -- PAGE 2
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

        d.     The physical address and coverage maps of cell towers used by the Target Cell Phone (**TT3**).

**4.**     **Prospective E-911/GPS and Cell Site Triangulation Information for TT3.**

        a.     All information about the location of the Target Cell Phone (**TT3**) described in Attachment A for **a period of 45 days**, during all times of day and night. This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

        b.     The physical address and coverage maps of cell towers used by the target cell phone (**TT3**).

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government pursuant to this warrant. In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

ATTACHMENT B -- PAGE 3
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## II.    Information to Be Seized by the Government

1.    All information described above in Section I that will assist in arresting OAKLEY, who was charged with violating 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 846 (conspiracy to distribute methamphetamine and heroin), and 18 U.S.C. § 1791(a)(1) and (b)(4) (attempting to provide contraband in prison) on August 20, 2020, is the subject of an arrest warrant issued on August 20, 2020, and is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4)..

2.    All non-content dialing, routing, addressing, and signaling information provided pursuant to 18 U.S.C. §§ 3121-3127 regarding Target Cell Phone (**TT3**).

3.    Location Information regarding the target cell phone (**TT3**).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by AT&T in order to locate the things particularly described in this Warrant.

ATTACHMENT B -- PAGE 4
USAO # 2019R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970